UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

E. DORTA,

            Plaintiff

v.

QUINNIPIAC UNIVERSITY,
DANIEL BROWN, VINCENT CONTRUCCI,
COURTNEY MCKENNA,
M. HENRICHON, D. LUPO,
JOHN DOE, JANE DOE

            Defendants

------------------------------------------------------X

Case Number:

**COMPLAINT**

**JURY TRIAL DEMANDED**

PLAINTIFF E. DORTA, by and through his undersigned attorneys The Law Office of J.A. Sanchez-Dorta, P.C., hereby alleges as follows, all allegations made upon information and belief:

## PRELIMINARY STATEMENT

1. Plaintiff E. Dorta ("Mr. Dorta"), a male student formerly attending college at Defendant Quinnipiac University, brings this action against Defendants Quinnipiac University, M. Henrichon, D. Lupo, John Doe and Jane Doe (collectively, "Defendants"). Plaintiff Mr. Dorta asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX") and state law for Defendants' knowing indifference to and participation in gender-based and race-based harassment, sexual harassment of and gender-based misconduct targeting Plaintiff Mr. Dorta that was known and participated in by Defendants, that was severe, pervasive and objectively offensive and that

deprived Plaintiff Mr. Dorta of educational opportunities. To remedy these claims, Plaintiff Mr. Dorta seeks damages and declaratory relief.

## PARTIES

2. Plaintiff Mr. Dorta ("Mr. Dorta") was, at all times relevant, a student at the University.

3. Defendant Quinnipiac University (the "University"), is a private university located in Hamden, Connecticut. Upon information and belief, the University receives federal funding for research and development and for other purposes, and has sufficient contacts with, and does business, in New York State to permit personal jurisdiction over the University in New York State. The University receives federal financial assistance and is therefore subject to the dictates of Title IX.

4. Daniel Brown ("Mr. Brown", or "Administration", or "Investigator") was, at all times relevant, the Assistant Dean of Student Affairs/Director of Campus Life and Chairperson, Title IX Grievance Committee at the University.

5. Vincent Contrucci ("Mr. Contrucci", or "Administration", or "Investigator") was, at all times relevant, the Director, Office of Community Services at the University.

6. Courtney McKenna ("Ms. McKenna", or "Administration" or "Investigator") was, at all times relevant, the Case Manager for Student Affairs at the University.

7. Ms. Henrichon ("Ms. Henrichon") was, at all times relevant, a student at the University.

8. Ms. Lupo ("Ms. Lupo") was, at all times relevant, a student at the University.

## VENUE AND JURISDICTION

9. This Court has subject matter jurisdiction over this action pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and diversity of citizen jurisdiction under 28 U.S.C. § 1332. For federal question jurisdiction, Mr. Dorta invokes title IX; and for purposes of diversity of citizenship jurisdiction, Mr. Dorta is a New York citizen, the amount in controversy well exceeds the statutory limit, exclusive of interest and costs, and the University is a Connecticut citizen. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District and/or because the University's business in New York is predominately located in this Judicial District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Dear Colleague Letter

11. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

12. The OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague Letter of April 4th, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

13. The DOE was authorized by Congress to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

14. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE.   Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action...that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue."   A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to... (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

15. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

16. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

17. The DCL states, Title IX requires that the school's inquiry into peer-on-peer sexual harassment and assault "must be prompt, *thorough, and impartial*." [Emphasis added]

18. As to any potential conflicts of interest, The DCL states, "*a school's investigation and hearings processes cannot be equitable unless they are impartial.  Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.*" [Emphasis Added]

### The Title IX Investigation

19. On Saturday, August 29th, 2015, an incident occurred involving Mr. Dorta and Ms. Henrichon which resulted in a Title IX Investigation Report (the "Report") and, ultimately, the expulsion of Mr. Dorta.

20. There are many inconsistencies between Ms. Henrichon's and Ms. Lupo's accounts in the Report, when compared to their own accounts and the accounts of others giving testimony in the Report, as discussed in greater detail below, which demonstrate that they were being less than truthful. The University was unwilling to see these inconsistencies for what they were – evidence of a fabrication, for reasons that violate their obligations to Mr. Dorta pursuant to Title IX, and pursuant to New York State Human Rights Law.

21. Mr. Dorta's account of what happened, as set forth in the Report, corroborates, in many regards, with the account of the alleged victim and her friends, and other persons giving testimony, even regarding admissions that might ordinarily be considered, and were definitely considered by Mr. Dorta, to be against his interest. For this reason, and others, as set forth below, it is manifestly the only account that does not demonstrate some evidence of fabrication.

22. Below is the "Summary of Respondent Statement" as set forth in the Report:

"Mr. Dorta reported that he began his evening on Saturday, August 30th at his friend Jeff Paz-Lerma's room where he was drinking. He and Paz-Lerma went to Village and then to the Bobcat at approximately midnight, where Dorta was feeling heavily intoxicated. He reported having a conversation with Ms. Henrichon and she was complimenting him and he suspected that she was also intoxicated because she was being forward. He, Lascarides and possibly Paz-Lerma then returned to Mountainview and he and Henrichon went to his bedroom because *he believed that Henrichon was interested in 'doing something' as a result of the compliments*. He and Henrichon were kissing and he stopped to throw-up in an attempt to sober-up. He then returned to the room where he and Henrichon continued to kiss and he attempted to remove her pants and *she seemed reluctant and he said, "You know, if you don't want to do this, you can go back to*

*your room." When he received no response he continued to remove her pants
and performed oral sex on Henrichon.* Dorta *then retrieved a condom* and
initiated intercourse with Henrichon, which continued until Henrichon wanted to
stop.   During intercourse Dorta produced his phone and began to film the
encounter.  When Henrichon noticed this action she told him "No" and he stopped
and deleted the video.  Henrichon then took the phone and deleted/ensured the
video was deleted and then they continued to have sex.  Following intercourse,
*Henrichon performed oral sex on Dorta.*  They both clothed themselves and Dorta
walked Henrichon back to her room where they hugged and he departed."[1]
[Emphasis added]

23. The above is a completely logical, consistent, credible account of what occurred

    that night.

24. Certain references to popular culture and history, discussed below in conjunction

    with that gleaned by the Report, will help one understand why and how there was

    gender and race based discrimination and misconduct in this case.

25. Any disinterested party, or anyone who would have been willing to look at this

    matter objectively would have realized that Ms. Henrichon and Ms. Lupo were

    lying, and Mr. Dorta was telling the truth.

26. Unfortunately, Defendant University and Defendant Administrator were not

    disinterested, and were not objective, because they harbored prejudices against

    Mr. Dorta, and because they were afraid of contradicting the allegations made by

    Ms. Henrichon and Ms. Lupo, due what might be termed the "Salem Witch Trial

    syndrome".  Upon information and belief, Defendant University knew or should

    have known that Ms. Henrichon and Ms. Lupo were lying, and still expelled Mr.

    Dorta in order to protect the Defendant University from any liability and Ms.

    Henrichon from any negative impact on her career.

_____

[1] Summary of Respondent Statement, page 8 of Report.

27. Due to litigation, public awareness, and the issuance of Federal Guidelines on dealing with sexual violence on campus (which was necessary in order to remedy an issue which has forever troubled university campuses) a climate of fear presently exists at the administration level of universities throughout the United States. This climate of fear practically guarantees that false accusations of sexual violence will have the same result as true allegations of sexual violence, because, as explained by the attorneys prosecuting the United States District Court for the District of Massachusetts, *Alyssa Leader v. Harvard University Board of Overseers, and President and Fellow of Harvard College*, in a recent article in the New York Times: "No one wants to known as the rape school".[2]

28. That the University and its staff would stop at nothing in order to shield itself from any potential liability or negative inferences by their acts is demonstrated by the letter sent subsequently sent to the Dorta family stating that Mr. Dorta had voluntarily "withdrawn" from the Defendant University, when it was manifest that he had been expelled.

29. The Salem Witch Trial Syndrome might be defined as a willingness of authorities, as a result of widespread hysteria (today, "college date rape" hysteria – then, witch hysteria) to overlook the obvious falseness of an allegation, in order to justify their own belief system, and to avoid any potential liability to themselves that might be incurred by questioning the veracity of the allegations (which might be deemed by others as aligning themselves with the accused).

---

[2] *Former Student Sues Harvard Over Handling of Sexual Crimes Complaints*, The New York Times, February 19, 2016.

30. As any student of American history and law will recall (and Defendant Henrichon will likely recall, as ironically enough she hails from that area of the world in which the Salem Witch Trials occurred[3]), the Salem Witch Trials involved false allegations of witchcraft against a number of (very likely innocent) individuals made by a number of impressionable and cowardly young women, which resulted in the prosecution and punishment of these (very likely innocent) individuals by the equally impressionable and cowardly authorities of the Massachusetts Bay Colony, who were themselves swept up in the witchcraft hysteria of the time.

31. As explained in Wikipedia, one of the first persons accused of the witchcraft was a Black or Carib-Indian Slave named Tituba, and the similarities between her and the Puerto Rican Mr. Dorta, whose genetic makeup very likely includes Native American (Taino and/or Carib-Indian) and African ancestry is as ironic as it is instructive for the otherwise unenlightened (that is, those who have never had the misfortune of having to walk in the shoes of a "Tituba"):

"Tituba, a *black or Indian* slave, *likely became a target because of her ethnic differences from most of the other villagers*. She was *accused of attracting girls* like Abigail Williams and Betty Parris with stories of enchantment from *Malleus Maleficarum*. These *tales about sexual encounters with demons, swaying the minds of men, and fortune-telling were said to stimulate the imaginations of girls and made Tituba an obvious target of accusations.*[29] *Each of these women were outcasts of a sort, satisfying many of the character traits typical of the "usual suspects" for witchcraft accusations, and left to defend themselves*. Brought before the local magistrates on the complaint of witchcraft, they were interrogated for several days, starting on March 1, 1692, then sent to jail.[30],4

---

[3] See, an article in the Salem News referencing a certain person with the same name as M. Henrichon (which doesn't appear to be an extremely common name): (http://www.salemnews.com/sports/lacrosse-collins-masconomet-girls-pull-away-from-beverly-in-season/article_17abff55-6c76-5f4a-a158-5c6e8f737ebb.html).
[4] https://en.wikipedia.org/wiki/Salem_witch_trials

32. These young woman had, it appears, been dabbling in the forbidden with the Black or Indian slave Tituba, and enjoying the same until the gravity of their transgression occurred to them and they found a very easy scapegoat, the Black or Arawak Indian slave, Tituba.

33. Ms. Henrichon had, it appears, been quite willing to dabble in that very likely forbidden to her, a sexual relationship with a Black/Hispanic member member of the opposite sex on the very first weeks of freshman year and, moreover, a of the opposite sex. Nevertheless, when the gravity of her transgression occurred to her, she had to find a scapegoat, the Black/Hispanic young man (the Puerto Rican Mr. Dorta, whose genetic makeup very likely includes Native American [Taino and/or Carib-Indian] and African ancestry), at a primarily Caucasian University. Mr. Dorta, like Tituba in Salem, was an easy *"target because of her [his] ethnic differences from most of the other villagers* [students/faculty at a predominately Caucasian University]. Mr. Dorta, like Tituba in Salem, was a *outcast[s] of a sort, satisfying many of the character traits typical of the "usual suspects" for witchcraft [rape] accusations [given his race, black skin color, and gender], and left to defend themselves."*

34. A. Wile, Ms. Henrichon's RA, admits that "She and Henrichon connected over being from the same area".[5] This demonstrates that Mr. Dorta was an outsider at the University, a place filled with insiders, Caucasian individuals with a upper middle class upbringing from the New England Area and he would be treated as an outsider.

---

[5] Report, Page 23, Alex Wile: September 10, 2015 at 9:30 am.

35. It is significant that A. Wile is member of what appears to be a predominately white sorority at the University, *Kappa Alpha Theta*. This statement is based upon a number of pictures obtained on the internet which were placed there by the sisters of *Kappa Alpha Theta*. In the pictures all of the women are Caucasian, with one exception. The Facebook picture of the entire sorority contains, among what appears to be at least a hundred, or perhaps couple of hundred women, one or two dark women, who are placed in the front of the picture, in a prominent place, apparently to demonstrate its diversity, since diverse groups cannot possibly be racist.



36. The irony herein demonstrates the veracity of that old adage, "Truth is stranger than fiction" and might even be cause for humor if the false allegations, and the scapegoating of Mr. Dorta by his own University, would not have had such a dire impact on Mr. Dorta's future career (and other) prospects.

37. This is because, quite frankly, the truth never changes, but lies are quite difficult to keep straight, especially in conspiracy with other liars, and Ms. Henrichon, as

is obvious based upon the photos showing her making quite merry with a group of boys, one holding a beer can and showing his well developed stomach (his other "six pack"), taken at the very time she was complaining to the university of having been psychologically damaged by an alleged act of sexual violence against her, is a liar.

38. The picture below was uploaded to Ms. Lupo's Facebook account on September 7, 2015.  Ms. Henrichon and Ms. Lupo are pictured at the bottom left, in a picture that was uploaded to Facebook on a date literally 9 days after the date Ms. Henrichon claimed she was raped by Mr. Dorta (August 29, 2015), 4 days after Ms. Henrichon gave her testimony in the case (September 3, 2015):



39. Ms. Henrichon's Impact Statement presented to the University in support of Mr.

Dorta's expulsion, which statement the University took at face value because its message fell on fertile ground, is set forth below:

40. "Dear Board Members,

> I have been sitting at my computer, staring at the screen for just about 15 minutes now.  I have absolutely no idea how to write how this has impacted my life.  I don't WANT to write, because it just brings up all the horrible memories over and over again.  *I can't be awake without thinking about it,* I can't sleep without being terrified.  I want to be done reliving this, having to play it over and over in my head.  *I shouldn't have to feel like he's going to come after me at any point in time, even when I'm locked in my room.*  I should be able to feel safe.  I shouldn't have to feel like my safety has been compromised while I attend school here.  Every time I see him, every time he looks at me, a tremor of fear runs throughout my body.  I can't go a day without thinking about what was done to me, how my body was subjected to something so horrible and how my mind and my well being have been compromised greatly because of it.  *I lost all my self confidence.*  I should be able to look in the mirror without all the negative thoughts about my face and body that buzz around me, but because of what happened I can't.  *I can't even say the full words of what happened.*  Because what happened to me, no one should ever have to go through.  If he did it once, he can do it again.  *I can't even talk to my parents,* the people that ground me, because I'm afraid to tell them this horrible thing happened to me and there is nothing they could have done to protect me.  If you ask me, that's every parents' worst nightmare.  *I can't focus in school and my grades are suffering because of this.*  I don't want pity and I don't want people to look at me different, but that's all I get now and it makes things worse.  I don't know how anyone could even subject another human being to what he did to me.

> Sincerely, Ms. Henrichon" [Emphasis Added]

41. Nevertheless, the above account simply doesn't square away with the pictures set forth below, which where obtained from Ms. Lupo's Facebook page (Ms. Henrichon's page, unfortunately but predictably, appears to have been cleared of any potentially incriminating photos) and, thus, appears to be nothing more that a cynically yet expertly drafted work of fiction for some college writing class, like drafted with the assistance of Ms. Lupo.

42. For instance, the first photo shows Ms. Henrichon with her mouth wide open in an obvious expression of joy and/or mirth, accompanied by Ms. Lupo, with an expression exuding confident bravado, and is emblazoned with the words "Quinnepac University". That photo indicates that it was uploaded on September 2nd, 2015, which was just about 3 or 4 days after Ms. Henrichon's alleged "rape" by Mr. Dorta. The picture simply does not appear to present the picture of a person who has been raped only 3 or 4 days previously, who might be able to convincingly state before a jury that "*I lost all my self confidence*". This picture, publicly available on Facebook (one doesn't even have to be a "Friend" of Ms. Lupo to find this and the other pictures referenced herein, as Mr. Dorta's attorney discovered these photos about 2 hours after his initial consultation with the Dorta family) was easily accessible to the University Administrators who investigated the charges which were led to Mr. Dorta's expulsion. Nevertheless, they simply did not care to investigate fully and did not care to question the veracity of the statements made by Ms. Henrichon and Ms. Lupo for the reasons set forth herein.



43. These other two pictures, uploaded to Ms. Lupo's Facebook page on September
2nd, 2015, also seems to indicate that Defendant Ms. Henrichon (on the right in
each picture) has not been so crushed by this alleged "rape" as she pretends to be.





44. Even if we might give Ms. Henrichon the benefit of the doubt, and assume that these pictures was taken before the incident, and uploaded to Facebook five days later (although, apparently, the younger generation uploads pictures pretty quickly to Facebook), what of the picture referenced above (the picture which shows Ms. Henrichon, with her tongue out, and Ms. Lupo, with her mouth open, both gleefully celebrating something with a group of at least three boys, one of whom has a beer in his hand and is shirtless, presenting his well developed "six-pack" and chest to the Ms. Henrichon, Ms. Lupo and the camera) which was uploaded to Facebook on September 7th, 2015, a full week and a few days after the alleged "rape" of Ms. Henrichon?  This picture, given the date it was uploaded to Facebook, was very likely not taken before the date of the alleged "rape" of Ms. Lupo by Mr. Dorta.

45. With all due respect, the above pictures simply do not appear to show the image of a person who was "raped" just a few days to a week before and has "lost all confidence" as a result of the same.

46. These photos seem to demonstrate the real the reason for her statement "*I can't focus in school and my grades are suffering because of this.*"  Ms. Lupo is simply having too much fun to focus on school, or anything else for that matter, and Mr. Dorta was simply a convenient scapegoat for her failures, given the present atmosphere on campus.

47. Other photos also uploaded on September 7, 2015 to Ms. Lupo's Facebook page (just about 9 days after the alleged rape and during the process of the hearings on the alleged rape, a difficult time for Mr. Dorta but evidently not such a difficult

time for Ms. Lupo) show a pretty well adjusted Ms. Lupo (not at all in line with the Ms. Lupo depicted in the expertly prepared Impact Statement), and one of the pictures shows Ms. Henrichon and Ms. Lupo, both with their mouths open in apparent gleeful celebration.  Interestingly enough, in that photo it appears that Ms. Henrichon is taking a "selfie", but that "selfie" is not present on her Facebook page, likely because Ms. Henrichon was not so foolish as to leave it on her Facebook page, or because she wiped her Facebook page clean of any incriminating pictures. The last picture shows Ms. Henrichon and Ms. Lupo together with a group of boys, one whom is clutching a beer bottle.