



48. Another photo also uploaded on September 7, 2015 to Ms. Lupo's Facebook page also shows a picture of the Ms. Henrichon and the Ms. Lupo at some sort of a

22

nightclub. Quite frankly, this is not he image of the person who Ms. Henrichon is trying to depict in her obviously hypocritical Impact Statement.



23

49. One could go on and on, but quite simply the pictures in no way portray a woman who had been raped on August 29, 2015. In fact, the pictures only demonstrate that she has lied, to the eternal detriment of Mr. Dorta.

50. The University did not look into the above, and did not consider the inconsistencies discussed below to be something that cast doubt on her testimony, because, as far as they were concerned, Mr. Dorta, an expendable outsider was already convicted, and they simply required a "kangaroo court" to convict him and expel him in order to protect them for any potential liability, which liability would include not only their liability under Title IX, but their liability for permitting persons who were not yet 21 years old to drink alcoholic beverages at "the Bobcat" and in their rooms.

51. For those who believe that gender discrimination and racism work entirely independent with one another (and that racism does not exist within the rarified confines of a New England university [Connecticut] campus, such as the University), the December 22, 2014 article featured in the Atlantic, "When Gender Discrimination and Racism Collide" is enlightening.

52. The article discusses a dispute at the University of Connecticut between a largely black sorority and a predominately white sorority over an iconic boulder at that campus affectionately known as the "Spirit Rock". According to University of Connecticut investigator's initial findings, white fraternity brothers physically intimidated the group of black women (swung a golf club to propel nearby trash towards the sorority members, hit the boulder several times with a football), hurling verbal insults at them, including "fat black bitch" and "whores". The

largely black sorority members called campus police during the incident, who compiled a report, opened an investigation, and ordered the white fraternity members to leave. It was alleged that some of the white fraternity members returned to view the black sorority members from a nearby building, presumably to intimidate them, according to the allegations.

53. University of Connecticut officials simply placed the predominately white fraternity on probation, stated that as punishment their activities would be "monitored and evaluated", and required that every member of the fraternity attend educational events "to address the underlying issues of this incident, including, but not limited to sexism, racism, bystander intervention, and micro-aggression".

54. Demonstrating how seriously the predominately white fraternity took the University of Connecticut's censure, "But just two days later, the fraternity held a party, violating the student code and terms of its probation, according to Reitz. PIKE held a second party a week later."[6], and for that reason lost its recognition at the University of Connecticut.

55. Under pressure, including a town hall meeting regarding the incident, which was not attended by the members of the white fraternity, but was attended by University of Connecticut Title IX investigators, a Title IX investigation was finally opened by the University of Connecticut.

56. Subsequently, a rumor began on the University of Connecticut campus that a member of the all black sorority had summoned members of an all black

---

[6] http://www.nbcconnecticut.com/news/local/Pi-Kappa-Alpha-Fraternity-Loses-Recognition-at-UConn-296484981.html

fraternity, emphasizing that these members of the all black fraternity are known to carry canes (and neglecting to consider that these fellows use these canes in step shows, a type of group performance).

57. To this rumor, the Atlantic points out:

"And whatever the outcome, this speculation raises new questions about the murky intersection of race and gender discrimination on college campuses. As UConn political science Professor Evelyn Simien asked at the November town hall, had a historically black fraternity confronted a predominately white sorority at the Spirit Rock what kind of response would have followed? The answer would, again, reveal the real way race, gender, and Title IX really work on campus".[7]

58. Interestingly enough, UConn's feed on a local social media app contained some of the following comments:

"FUCK AKA YOU FAT BLACK BITCHES"

"Yancy is fat and black. And a bitch."

"Fat n black describe her accurately. Why [sic] else does she want?"

"Goddam do you not realize Yancy idolizes Jesse Jackson? SHE turned this into a race war. Nobody in pike [the predominately white fraternity] is racist, it was a heat of the moment dumb comment. It's her moment to shine. Don't let it be."

59. Regardless of the Defendants expected denial of racism, it is clear that racism exists at the University and its surroundings (New England, Connecticut), the Defendants allowed their racial prejudices and preferences to color their judgment and statements in the Title IX investigation of Mr. Dorta, and they are thus are thus liable for their actions under a variety of legal theories.

---

[7] http://www.theatlantic.com/education/archive/2014/12/when-gender-discrimination-and-racism-collide/383967/

26

60. It is worthwhile inquiring what the Student Code of Conduct of the University has to say about lying to the administration in order to secure Mr. Dorta's expulsion. For example, the Report cites that:

"The Investigators believe that the following may have been breached by the Respondent, ... [Mr.] Dorta:

Student Code of Conduct 3A

conduct that is *disruptive to the University community,* disturbs the peace *obstructs University objectives* and/or operations, *interferes with the rights and/or activities of others* and/or *interferes with the performance and duties of University staff*

See Pg. 66 of the Student Handbook

Student Code of Conduct 5C

actions that inflict physical harm, physical abuse, *mental distress or injury to any person*

See Pg. 66 of the Student Handbook" [Emphasis added]

61. Since it would be clear to any *disinterested and unbiased* person that it is Ms. Henrichon and Ms. Lupo, rather than Mr. Dorta, who have lied, setting in motion a process set up and inexpertly managed by the University, resulting in Mr. Dorta's expulsion for a consensual sexual act, it is obvious that it is Ms. Henrichon and Ms. Lupo who have violated Student Code of Conduct 3A and Student Code of Conduct 5C, and thus, it is they who should be prosecuted by the University for violation of these sections of the Student Code.

62. Nevertheless, Ms. Henrichon and Ms. Lupo's lies would have had no impact if they had not fallen on fertile ground.

27

63. Questions and Answers requires that, "a school must give the complainant any rights that it gives to the alleged perpetrator. *A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.*" [emphasis added]

64. However, it is clear that Mr. Dorta had about the same chances at "*A balanced and fair process that provides the same opportunities to both parties*" that would "*lead to sound and supportable decisions*" as did the unfortunate Arawak and/or Black slave Tituba during her trial in Salem for witchcraft.

65. Mr. Dorta, a black Hispanic young man from a predominately black/Hispanic lower middle class neighborhood in the Rockaways, Queens, New York, could never, ever, in the atmosphere in which the allegations were made against him, in a university with a predominately Caucasian student body, with a predominately Caucasian administration, in a predominately Caucasian piece of the United States, have expected to have received the same opportunities as a young Caucasian girl from New England.

66. It is a well known requirement in a civil or criminal trial that a person has a right to a trial by a jury of his peers. This is because this system works pretty well in so far as the trier of fact can identify with the parties and the circumstances of the dispute.

67. Regardless of the procedure followed here, there is no way that Mr. Dorta would have received the benefit of a fair process, because the triers of fact in this case, the University Administrators, looked Ms. Henrichon and saw a sister, or a

daughter, and when they looked at Mr. Dorta they saw some "other", a Black Hispanic man.

68. Mr. Dorta is however, a son to his parents, and by entrusting their son to the University, and by paying tuition, they were entitled to expect that their son would be treated the same as any student, Caucasian or Black, Male or Female, and without regard to socioeconomic factors. The trauma the Dorta's have suffered at the institutionalized betrayal by the University is manifest to any person who has a young son, regardless of the color and socioeconomic status of that son.

69. On April 29, 2014, the OCR issued a document called Questions and Answers on Title IX and Sexual Violence ("Questions and Answers") in an attempt to "further clarify the legal requirements and guidance articulated in the DCL."

70. As with the DCL, the OCR has determined Questions and Answers to be a "significant guidance document" intended to provide additional guidance concerning obligations under Title IX to address sexual violence as a form of sexual harassment.

71. Questions and Answers requires that training for employees involved in school grievance procedures include:

- working with and interviewing persons subject to sexual violence;
- particular types of conduct that would constitute sexual violence;
- the proper standard of review for sexual violence complaints;
- consent and the role drugs or alcohol can play in the ability to consent;
- how to determine credibility;

29

- confidentiality; and
- the effects of trauma, including neurobiological change.

72. Without a doubt, the Defendant University has likely trained its administrators well in all of the above, but for some reason these same administrators neglected to even consider the conflict between the story painted by Ms. Henrichon and Ms. Lupo and the pictures on their Facebook pages, although the conflict occurred to Mr. Dorta's attorney within about 2 hours of his first consultation with the Dorta family regarding a lawsuit against the University.

73. One can be pretty sure that Ms. Henrichon sanitized her Facebook page pretty soon after she made the allegations, deleting pictures (evidence) from her Facebook page (the college student's version of shredding documents).

74. Unfortunately for her Ms. Lupo was evidently sufficiently confident that the University administrators would either not look at her Facebook page, not request the pictures on her Facebook page, or even if they had, not care to question whether or not these picture might shed some light on the consistency and credibility of their testimony.

75. Quite simply, the purpose of the procedures put in place by the University in compliance with Title IX were not put in place in order to get at the truth and arrive at a just decision, but for the simple purpose of protecting themselves from any potential liability.

76. Nevertheless, once the wheels of Title IX, as interpreted by the University was put in motion, there was no turning back for Ms. Henrichon, and she had to continue with her lie.

77. In the Movie "To Kill a Mockingbird", based on the book by Harper Lee of the same name, a black man, Tom Robinson, is charged with the rape of a white woman, Mayella Ewell, and is defended by a lawyer, Atticus Finch, at his trial in the fictional southern U.S. town of Maycomb, Alabama, during the 1930s.

78. At one point in the trial, during the cross examination of Robert E. Lee 'Bob' Ewell, the father of the alleged victim, Mayella Ewell, Atticus Finch cross-examines Mr. Ewell, who during his direct examination has (as it later becomes obvious, perjuring himself) stated that he has witnessed the attack:

"'Folks were doing a lot of running that night. Let's see now – you say that you ran to the house, ran to the window, you ran inside, you ran to Mayella, and you ran to Sheriff Tate. *Did ya, during all this running, run for a doctor?*"

79. Mr. Ewell responds with an utterly illogical and self serving statement, "There wasn't no need to, I seen who done it."

80. The Summary of Complaint states: "Henrichon declined to go to Student Health and Wellness because Dorta had "used a condom." Henrichon also declined to report the incident to Hamden PD and did not want her parents to learn about the incident."

81. This statement by Ms. Henrichon is equally illogical and self-serving as Mr. Ewell's statement. *A medical exam would have helped to have determined whether the sex was consensual or not, regardless of the use of a condom.*

82. Ironically enough, in the movie, the prosecutor seems to know he has an open and shut case, actually, during Atticus Finch's cross examination of the police officer, hanging his leg over his chair like a schoolboy who couldn't be bothered to show respect for either his teacher or the class.

31

83. The University and its Administrators have shown equal disdain and disregard for their obligations under Title IX, and their obligations to Mr. Dorta and his parents. This is because, like the prosecutor, they seem to feel that they "hold all the cards". After all, they control the process, and were faced with the weak opposition of a black Hispanic man, the first one of his immediate family to attend college, and his parents.

84. This black Hispanic man and his working class parents were handicapped *vis a vis* the University by the fact that they are working class individuals who have never had to deal with the hypocrisy of a University system dominated by well behaved and well educated individuals who know precisely what lines they may cross (and what lines they may not cross) in order to develop a prosecution and render a judgment that is derived primarily through prejudices borne by racial and gender discrimination but, to the untrained eye, does not seem to be.

85. These are not fellows that are going to directly call Mr. Dorta a "N____r" or a "Sp_c", as they are far too well educated to do so, but they can feel free to treat him like a "N____r" and a "Sp_c" if they can expect no consequences, because, to them, that is precisely what he is.

86. For the University, Mr. Dorta is a "N_____r" and a "Sp_c" from a working class family who has been permitted to attend their predominately white college only because they are required to do so in order to maintain the Federal funding that they so much require and to deflect any criticism that they are a bastion of white privilege by pointing to students such as Mr. Dorta as evidence of their racial and socioeconomic "diversity".

87. That the University and its staff would stop at nothing in order to shield itself from any potential liability or negative inferences by their acts is demonstrated by the letter sent to the Dorta family stating that Mr. Dorta had voluntarily "withdrawn" from the Defendant University, when it was manifest that he had been expelled.

88. Mr. Dorta, and others like him, are tolerated at the University, as long as they "know their place". Nevertheless, when they "step out of line", and have sexual relations with the Caucasian women at the University, they do so at their peril, because they risk inciting a fear that is just below the surface in the Caucasian administrators, a fear that they have manifestly inherited from their forefathers but cannot express in the new "age of colorblindness" in which we live and thus must express in a different way.

89. They fear the black or Hispanic man, the "Beast" who is quite eager to despoil their "innocent" Caucasian women, like poor Mayella Ewell, who could not possibly have consensually engaged in sexual contact with such a Beast.

90. Nevertheless, they cannot lynch Mr. Dorta, as their forefathers of just a few generations ago might have done with impunity. So, they simply find another way to assuage their fears and "put" men like Mr. Dorta "in their place".

91. They convene a "kangaroo court"[8], handle the process with complete disregard for the most basic rules of logic and concepts of justice and fairness, expel the student, and attempt to cover up this expulsion to keep their Federal funds.

---

[8] "A **kangaroo court** is a judicial tribunal or assembly that blatantly disregards recognized standards of law or justice, and often carries little or no official standing in the territory within which it resides. Merriam-Webster defines it as a 'mock court in which the principles of law and justice are disregarded or perverted'". https://en.wikipedia.org/wiki/Kangaroo_court

92. They, thus, effectively taint Mr. Dorta's name for all time in the eyes of anyone (a future college, employer, or any individual person) who would care to conduct the most rudimentary investigation of Mr. Dorta's background, would care to inquire of Mr. Dorta as to why, in fact, he has missed an entire semester of University, and would be responded to by Mr. Dorta with the same honesty he has demonstrated throughout the process (unlike the Ms. Henrichon and Ms. Lupo): "I was expelled from the University because of false allegations that I raped another student".

93. Mr. Dorta's experience with the Defendants "illustrates, in many respects, the old adage as underscored in the book "The New Jim Crow": "The more things change, the more they remain the same."[9]

94. Attorney Michelle Alexander explains the impact of this old adage in her New York Times Bestseller, "The New Jim Crow", a book which has apparently influenced recent efforts at reform of the criminal justice system to combat its disproportionate impact on men of color:

"What has changed since the collapse of Jim Crow has less to do with the basic structure of our society than with the language we use to justify it. In the era of colorblindness, it is no longer socially permissible to use race, explicitly, as a justification for discrimination, exclusion and social contempt. So we don't. Rather than rely on race, we use our criminal justice system to label people of color "criminals" and then engage in all the practices we supposedly left behind. Today it is perfectly legal to discriminate against criminals in nearly all the ways that it was once legal to discriminate against African Americans. Once you're labeled a felon, the old forms of discrimination – employment discrimination, housing discrimination, denial of the right to vote, denial of educational opportunity, denial of food stamps and other public benefits, and exclusion from jury service – are suddenly legal. As a criminal, you have scarcely more rights, and arguably less respect, than a black man living in Alabama at the height of Jim

---

[9] The New Jim Crow, Michelle Alexander, page 1.

34

Crow. We have not ended racial caste in America; we have merely redesigned it."[10]

95. Mr. Dorta has not been charged with any crime, and he could not be, and (save any effort by Defendants to attempt to unlawfully retaliate against Mr. Dorta) will not be. Nevertheless, he has been, for all intents and purposes, labeled a felon, a rapist by his own University, a University to which his mother and father, in initially ignorant bliss, eagerly entrusted their only child under the mistaken assumption that he would be treated the same as any other student, in spite of his color, ethnic origin, gender and socio-economic background.

96. Without a doubt, there might be some that would scoff at this analogy. But Mr. Dorta knows all too well how relevant this analogy would be, and those who would scoff should simply count themselves fortunate not to have been born, as was Mr. Dorta, a black Hispanic male, from a working class background, with the misfortune to have been able to generate a GPA that would make him a candidate for admission to a University which, in fact, was a very dangerous place for him to be.

97. These people should consider Atticus Finch's statement that: "You never really understand a person until you consider his point of view, until you climb inside of his skin and walk around in it".

98. The fact that Ms Henrichon states that she didn't want the incident reported to her parents could be due to a number of factors. One factor, however, must be due to the fact that Ms. Henrichon hails from a part of New England called

---

[10] The New Jim Crow, page 2.

Beverly, Massachusetts, famous for its connection to the Salem Witch Trials, and also known for being predominately white and relatively affluent.

99. Wikipedia notes, with regard to Beverly, Massachusetts, that "The racial makeup of the city is 83.4% White, 2.6% African American, 0.2% Native American, 8.7% Asian, 0.03% Pacific Islander, 0.52% from other races, and 1.6% from two or more races. 2.3% of the population are Hispanic or Latino of any race."[11] Wikipedia also notes that "The median income for a household in the city is $53,984, and the median income for a family is $66,486. Males have a median income of $45,348 versus $35,659 for females. The per capita income for the city is $28,626. 5.7% of the population and 4.0% of families are below the poverty line. Out of the total population, 6.5% of those under the age of 18 and 5.2% of those 65 and older are living below the poverty line."[12]

100. It is worthwhile, then, to compare the demographics of Beverly, Massachusetts, the hometown of Ms. Henrichon, to Far Rockaway, Queens, the hometown of Mr. Dorta. According to one community report "Almost one in three Far Rockaway households had a total annual income of under $25,000[3] and 34% of children residing in Far Rockaway are living below the poverty level[4]. FR also reports a 14% unemployment rate (almost double the national rate of 7.8%[5]). Over 35% of residents require financial support, including cash assistance (TANF), supplemental security and Medicaid."[13] Moreover, in Mr. Dorta's

---

[11] https://en.wikipedia.org/wiki/Beverly,_Massachusetts#Demographics (November 9, 2016).
[12] Ibid.
[13] http://www.safespacenyc.org/safespace/section_1/section/FY2013_Bulleted_Community_Statistics.pdf (November 9, 2016).

neighborhood, the ethnic and racial makeup is quite different from Ms. Henrichon's neighborhood.

101. Ms. Henrichon's father has donated to the Republican party and, thus, one can assume that he is a Republican. From an initial glance, and the Court will excuse the harmless generalization made in order to simply prove a point in a case "chock full" of quite harmful generalizations, but it simply does not appear that Ms. Henrichon's parents are the types of people who would be very pleased to know that their daughter had been romantically involved with a black Hispanic man, from Far Rockaway, Queens.

102. Her decision not to tell her parents likely spared her from the any type of reproach from her parents, as Mayella Ewell was unable to avoid receiving from her father for her consensual kiss with Tom. They might not have beaten her, as Bob Ewell beat Mayella, but one can assume that it would not likely have been a happy day at the Henrichon family home.

103. One wonders, however, if the involvement of Ms. Henrichon's parents would have, perhaps, clarified the issue in a manner which might not have resulted in the expulsion of Mr. Dorta, because no one knows their child, and whether that child is telling the truth or not, better than that child's parent.

104. One wonders, moreover, if the University was not obligated to inform Ms. Henrichon's parents of the incident, and whether their failure to do so entitles Ms. Henrichon's parents to also commence a lawsuit against the University, at the very least to recover the damages that this lawsuit will extract from their daughter, Ms. Henrichon who, in contrast to Mr. Dorta, fully (and, perhaps, mistakenly)

37

expects to emerge from the University in four years or so with her degree in whatever and a spotless reputation as she enters the workforce?

105. In the movie, Mayella is asked whether or not she remembers her alleged rapist hitting her in the face, along the lines of testimony offered by her father, and she replies, "No, I don't recollect."

106. Again, ironically enough, Ms. Lupo's offers the following testimony, which Ms. Henrichon was unable to corroborate:

> ""Lupo reported that Henrichon related that Henrichon kept saying 'stop' and *Dorta eventually covered Henrichon's mouth.* When intercourse concluded, Lupo reported that *Henrichon was bleeding* and left the room". [emphasis added][14]

107. During her September 24th, 2015 interview with University Authorities (during which time she was, oddly enough, accompanied by Ms. Lupo as her advisor), the University "Investigators asked whether Dorta attempted to muffle sound or keep her from saying anything. Henrichon replied that *she could not recall*. When asked if he put his hand over her mouth she responded, "I really don't like to think about this."[15] [Emphasis Added] A convenient excuse.

108. First of all, no one at the University questioned the logic of having Ms. Lupo, a witness, also accompany Ms. Henrichon "as Advisor" at both her September 3 and her September 24, 2015 testimony. A witness in a civil or criminal matter is not ordinarily, for instance, permitted to serve as an advisor or attorney in the action. It should have occurred to the investigators that Defendant Lupo's testimony might have been colored by, not only what she heard the Ms. Henrichon tell her before she gave her testimony, when the met in their room and

---

[14] Ms. Lupo Testimony, Tuesday, September 8th, 2015, at 2:30 pm, page 15 of Title IX Investigation Report.
[15] Ms. Henrichon Testimony, September 24, 2015 at 9:30 am.

had the opportunity to imagine and concoct a whole host of details about what occurred that fateful night.

109.    Secondly, it makes more sense to assume, that like Mr. Ewell and Mayella, who couldn't get their story straight, that neither could Ms. Henrichon and Ms. Lupo (in spite of the fact that they were in the same room, Ms. Lupo serving as Ms. Henrichon's adviser), and that this is because only the truth is easy to keep straight, as lies are quite difficult to keep straight in one's own head, let alone among two people who are committed to lie.

110.    Ms. Henrichon had never mentioned anything in her September 3, 2015 testimony along the lines of that testified to by Ms. Lupo, that is, Mr. Dorta's hands over the mouth and/or the vaginal bleeding (which would, one would expect, constitute pretty significant details – especially since, if there had been bleeding, Ms. Henrichon should have gone to a doctor, regardless of the fact that Mr. Dorta was wearing a condom when he allegedly raped her), as these were obvious embellishments by Ms. Lupo, a nursing student who seems to consider herself a medical professional at the tender age of 18 or 19 years.

111.    The September 24th, 2015 testimony, is fascinating:

"Investigators told Henrichon that in their interview with Dorta, he mentioned some actions that were not included in her interview. Investigators then asked whether Dorta had used his phone to record or take photos during intercourse. Henrichon then reported that Dorta started to take video and 'I told him not to. Because I did not want him to do that and made him delete the video…Henrichon reported that she witnessed Dorta deleting the video. Investigators reported to Henrichon that Dorta described a number of actions during sex, which included her performing oral sex on him following intercourse. Henrichon responded that *she does not recall* or believe that she performed oral sex on Dorta."[16]

---

[16] Ms. Henrichon Testimony, September 24, 2015 at 9:30 am.

39

112. The University Investigators obviously didn't consider any of these inconsistencies and omissions to suggest that Ms. Henrichon and Ms. Lupo may have been lying. Mr. Dorta admitted details, for example, the filming and the oral sex she performed on him, regardless of the fact that these details could, and did, prejudice his position, but Ms. Henrichon left out these details for any host of reasons, all of which, regardless, would suggest that her testimony was selective and much less than truthful.

113. As the September 24, 2015 testimony continues: "Henrichon indicated that she was not interested in participating in a board hearing if a board hearing was necessary. When informed that she would receive a copy of the report Henrichon asked, "Do I have to read it?" The Investigators informed her that she did not, but it was something that would be provided to her. Henrichon expressed that she did not want to participate because, whenever she speaks about the incident it, "takes me back to that place and I don't want to go there."[17] Again, the University Investigators couldn't see this for what it was, that is, another convenient excuse, because their mind was already made up as to what occurred that night and who was to blame – black Hispanic male Mr. Dorta.

114. Interestingly, as the University Investigators continue to pry during the September 24th testimony as to what occurred the night of the alleged rape, Ms. Henrichon can't recall any details and, conveniently, blames that on her alleged intoxication: "Investigators asked Henrichon whether Dorta accompanied her back to her room when she left his suite. Henrichon responded that she does not recall how she got back to her room…Investigators then asked about Henrichon's

---

[17] Ms. Henrichon Testimony, September 24, 2015 at 9:30 am.