level of intoxication…She reported that on a scale on (sic) 1-10 she was 'a six'. When asked to describe what a 'six' is like for her she reported that she cannot focus on things, is dizzy and is not really able to remember things the following day… Henrichon reported feeling nervous when she passes between Ledges and Mountainnview (sic) and the stairwell in Mountainview. She indicated *that her anxiety stems from the possibility of 'just seeing him'.* "[18] [Emphasis added]

115.     Unfortunately for Ms. Henrichon (or, rather, it would have been unfortunate for her had the University Investigators not harbored a bias against Mr. Dorta), her convenient excuse of intoxication is directly contradicted by the only disinterested person offering testimony in this entire matter, Ms. Feldman, who gives testimony on September 16, 2015 that "she did not know Henrichon before that night, but said that Henrichon did not exhibit any intoxicated behaviors, or slower responses like she has seen with other people when they are drunk".[19]

116.     It seems more likely that Ms. Henrichon's selective memory, her unwillingness to discuss more details, her unwillingness to engage any further in the process, and the anxiety brought on by the possibility that she might run into Mr. Dorta in the hallway was due to factors more in line with those experienced by Mayella.

117.     In "To Kill a Mockingbird", Mayella makes every effort to avoid eye contact with Tom. She has a selective memory, is unwilling to discuss more details, and is unwilling to engage any further in the process. She actually loses

---

[18] Ms. Henrichon Testimony, September 24, 2015 at 9:30 am.
[19] Ms. Feldman Testimony, September 16, 2015 at 9:30 am.

her temper when she is pushed to engage in the process, attacking those around her.

118.    When she is asked, "Is this the man that raped you?"  "How?", Mayella replies, "I don't know how, he just done it" and, when pressed, she attempts to end any further inquiry by stating:

"I got somethin' to say. *And then I ain't gonna say no more.* He took advantage of me. An' if you fine, fancy gentlemen ain't gonna do nothin' about it, then you're just a bunch of lousy, yella, stinkin' cowards, the - the whole bunch of ya, and your fancy airs don't come to nothin'. Your Ma'am'in' and your Miss Mayellarin' - it don't come to nothin', Mr. Finch, not... no."

119.    Now, why was Mayella so emotional?  Because she had been roped into a trial she ultimately didn't want, because she had been caught lying, because she had done something that she was, due to the society she lived in, ashamed of having done, and she needed a scapegoat, Tom.   Yet it was ultimately very painful to deal with the guilt that comes with maintaining a lie that she knew was going to hurt a person she knew to be innocent, and she just wanted to get over with it.

120.    Same with Ms. Henrichon.  She was a white girl (a girl who doesn't appear to have a single black friend on her Facebook page, whose friends don't appear to have a single black friend on Facebook), she had slept with a black Hispanic man from a lower socio- economic background than her own, and her white mother and white father, from a relatively higher socio economic background would be too happy with it if they found out. She had started a process that, once it started, took on a life of its own.  She knew she was lying and was afraid of being caught in her lie, but because she had done something that she

was, due to the society she lived in, ashamed of having done, and she needed a scapegoat, Mr. Dorta. Yet it was ultimately very painful to deal with the guilt that comes with maintaining a lie that she knew was going to hurt a person she knew to be innocent, and she just wanted to get it over with as quickly and painlessly (for her) as possible.

121.     Mr. Dorta was honest, and even expressed remorse for what he may have done, as well as pity for Ms. Henrichon, although it has since become quite obvious that she didn't deserve his pity. Again, we return to "To Kill a Mockingbird". Tom also makes the inexcusable mistake of showing pity for Mayella. These are the hallmarks of a person with integrity, and concern for others, and a sense of shame for what little they may have done that they might consider wrong, even though there is nothing essentially wrong with what they have done. This is completely contrasted by the Defendants, who have no integrity, are concerned only with themselves (avoiding punishment from her parents, avoiding liability as a University) and have no sense of shame, as long as they are able to get away with something without it being revealed in the light of day, it never happened:

**Atticus Finch**: [*his closing statement*] "To begin with, this case should never have come to trial. The state has not produced one iota of medical evidence that the crime Tom Robinson is charged with ever took place... It has relied instead upon the testimony of two witnesses, whose evidence has not only been called into serious question on cross-examination, but has been flatly contradicted by the defendant. Now, there is circumstantial evidence to indicate that Mayella Ewel was beaten - savagely, by someone who led exclusively with his left. And Tom Robinson now sits before you having taken the oath with the only good hand he possesses... his RIGHT. I have nothing but pity in my heart for the chief witness for the State. She is the victim of cruel poverty and ignorance. But my pity does not extend so far as to her putting a man's life at stake, which she has done in an effort to get rid of her own guilt. Now I say "guilt," gentlemen, because it was

guilt that motivated her. She's committed no crime - she has merely broken a rigid and time-honored code of our society, a code so severe that whoever breaks it is hounded from our midst as unfit to live with. She must destroy the evidence of her offense. But what was the evidence of her offense? Tom Robinson, a human being. She must put Tom Robinson away from her. Tom Robinson was to her a daily reminder of what she did. Now, what did she do? She tempted a Negro. She was white, and she tempted a Negro. She did something that, in our society, is unspeakable. She kissed a black man. Not an old uncle, but a strong, young Negro man. No code mattered to her before she broke it, but it came crashing down on her afterwards. The witnesses for the State, with the exception of the sheriff of Maycomb County have presented themselves to you gentlemen, to this court in the cynical confidence that their testimony would not be doubted, confident that you gentlemen would go along with them on the assumption... the evil assumption that all Negroes lie, all Negroes are basically immoral beings, all Negro men are not to be trusted around our women. An assumption that one associates with minds of their caliber, and which is, in itself, gentlemen, a lie, which I do not need to point out to you. And so, a quiet, humble, respectable Negro, *who has had the unmitigated TEMERITY to feel sorry for a white woman,* has had to put his word against TWO white people's! The defendant is not guilty - but somebody in this courtroom is. Now, gentlemen, in this country, our courts are the great levelers. In our courts, all men are created equal. I'm no idealist to believe firmly in the integrity of our courts and of our jury system - that's no ideal to me. That is a living, working reality! Now I am confident that you gentlemen will review, without passion, the evidence that you have heard, come to a decision and restore this man to his family. In the name of GOD, do your duty. In the name of God, believe... Tom Robinson."

122.    Like Mayella, Defendant Henrichon was motivated by guilt, and the understanding that "she must destroy the evidence of her offense", that is, Mr. Dorta, by getting him expelled from the University.

123.    Also, like Mayella, "No code mattered to her before she broke it, but it came crashing down on her afterwards".  That is precisely why this Ms. Feldman found Ms. Henrichon crying in the hallway.  Ms. Henrichon knew her friends saw her leave with Mr. Dorta, she knew that Mr. Dorta could tell anyone he wished about the fact that they had had consensual sex and everyone would believe him, despite the fact that she had told him to erase the cellphone footage demonstrating that the sex was consensual (erasing the evidence wasn't enough). Like the

cellphone footage, she wanted to erase her guilt. She simply did not want to be known as the girl who, the first week of College, slept with another freshman, and especially when that other freshman was a black Hispanic freshman whose father doesn't own his own company, as her father does. After all, no one wants to be known throughout her four years of college as the "slut of freshman week".

124.    One might even feel sorry for her, a victim of ignorance, a victim of a double standard which, brands a woman as loose when she engages in consensual sexual intercourse and rewards a man.

125.    This double standard, however, should be seen for what it really is. A double edged sword which, by branding a woman who consents to a sexual act a "slut", and a man as a "stud", also relieves a woman of responsibility for her consent to engage in a sexual act. The man, the "stud", is also the conqueror, and the woman is the conquered. And it is in this context that a woman, who engaged in a consensual sexual act with a man might easily accuse the man of rape, set into motion the wheels of a University system which is set up not so much as to get at the truth of what occurred and resolve the matter, but to protect itself in the Salem witch Trial-like atmosphere in which the only one who is safe is the one who accuses someone else of witchcraft – there is only safety for the accuser and those who join her in accusing the wrongfully accused.

126.    Interesting to consider how little we have changed, in essence, from 1932 south of the US. No, the faculty of the University did not show up at Mr. Dorta's dorm room to lynch him, as Mr. Cunningham and his lynch mob showed up at Tom's jail cell. Rather, they destroyed him in a much more subtle way, with

damages that wouldn't show up immediately, but rather, down the line as Mr. Dorta attempted to apply to other colleges and attempted to locate employment and, if he determined to be honest he would forever have to carry the stigma as having been expelled, and if they pried, would have to say, he was expelled for raping a woman.

127.    This is a twentieth century lynching, only more subtle, but just as safe for the lynch mob in the 1930's – since, after all, they were only doing what is socially acceptable (as publicly lynching a black man in the 1930's South was socially acceptable yet, nowadays, it is not so socially fashionable).

128.    Moreover, this lynching continued to occur well after the expulsion of Mr. Dorta, as his character was maligned, for no reason, by faculty at the University. A friend of Mr. Dorta on December 4th 2015 texted him that with regards to a statement made by a Dr. Franklyn, English teacher at the University:

"Lol he was like 'we started with 19 now we're down to 18 I was told that a certain someone is not allowed on campus it I see him I have been told to alert public safety".

129.    Mr. Dorta was lead to believe that the "certain someone" referred to by Dr. Franklyn who was "not allowed on campus" and for whom, like a common criminal, "public safety" had to be alerted if he is seen on campus, was Mr. Dorta himself.  Moreover, since he was number 19 in a class "down to 18", that he was this certain someone was obvious to every one of the remaining 18 students.  So much for the confidentiality of the Title IX process at the University, insofar as it applies to Mr. Dorta.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (For Violation of Title IX)

130.     Mr. Dorta repeats each and every allegation hereinabove as if fully set forth herein.

131.     The University's policy and practice is Gender-Biased against Males, in particular, non-Caucasian males from lower socioeconomic background.

132.     Title IX Bans Sex-Based[20] stereotyping and overgeneralization.

133.     With Title IX, Congress tried to "avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices".[21]

134.     One of the most important aspects, to enforce such an environment free of discriminatory practices is the ban of "sex-based stereotyping and overgeneralization".[22]

---

[20] "Sex-based" in the sense of "gender-based" (Compare Nungesser vs. Columbia, Memorandum and Order, p. 9,10). Governmental agencies such as the U.S. Equal Employment Opportunity Commission (EEOC) which, in its own words, "is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person's race, color, religion, sex (including pregnancy), national origin, age (40 orolder), disability or genetic information." (https://www.eeoc.gov/eeoc/, accessed April 19, 2016) use the terms "sexbased discrimination" synonymously with "gender-based discrimination" (compare https://www.eeoc.gov/laws/types/sex.cfm, accessed April 19, 2016). Also, the U.S. Department for Education's Office of Civil Rights uses the term "based on sex" synonymously to "based on gender" in its 2011 "Dear Colleague Letter" which clarified the fact that the OCR's Title IX interpretation includes the responsibility for schools and universities to regard sexual assault and rape as a violation of civil rights and adjudicate these cases. For clarification purposes and to avoid misunderstandings this complaint uses the term ~ender-based" whenever not explicitly citing or referring to an existing discourse as it does in this section. The term "sex-based" in this section is taken from Cornelia Pillard (see below), whose important comment on gender discrimination is discussed here. Nowhere in this complaint is the use of the term "sex-based" intended to mean "based on an act of sex".

[21] *Canon v. Univ. of Chicago*, Opinion, p. 7f.

[22] Pillard, Cornelia: Our Other Reproductive Choices: Equality in Sex Education, Contraceptive Access, and Work Family Policy (2007). 56 Emory L.J. 941, 948 (2007). http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi? article=1 191 &context=facpub, accessed April 21, 2016.

135.     Sex-based stereotyping consists of ascribing gender roles and the expectation

to behave according to these roles to all women and men,[23] they are constructed in a

binary way. Such ascribed stereotypical gender roles contain non-sexual behavior as

well as sexual behavior.

136.     Judge Cornelia T. Pillard, United States Circuit Judge of the United States

Court of Appeals for the District of Columbia Circuit, highlights why this kind of

stereotyping violates Title IX:

The Supreme Court's recent equal protection jurisprudence sets a very high bar
against sex-based stereotyping and overgeneralization. Under a line of cases
culminating in United States v. Virginia (VMI),[24] even statistically accurate
generalizations about "typically male or female tendencies" - such as men's
greater aggressiveness versus women's comparatively more cooperative
temperament, or men's tendency to harass and women's victimization by
sexharassment - cannot be grounds for official, sex-based discrimination.[25]

Judge   Pillard   explains   why   sex-based   discrimination   is   considered

unconstitutional:


VMI builds on a long line of precedent that treats even laws enacted ostensibly to
favor or protect women as unconstitutionally discriminatory due in large part to
the stereotypes they perpetuate. ( ... ) It thus recognizes that sex-role stereotyping
is itself harmful because it projects patriarchal messages that make discrimination
at once more likely and less apparent."[26]

---

[23] Sex-role beliefs become sex-role stereotypes when individuals employ those sets of behaviors
as rules to be
applied to all males and females." (http://psychology.jrank.org/pages/575/Sex-
Roles.html#ixzz446hCnZgT,
accessed April 24, 2016).
[24] 518 U.S. 515 (1996)
[25] Id. at 541, 544, 550
[26] Pillard, Ibid.

137.    The University's "Sexual Misconduct and Harassment Policy" does not even address the issue of sexual stereotyping, while other similarly situated universities do.

138.    Other similarly situated universities do address Sexual Stereotyping, precisely because it is considered a form of Gender-Based Harassment according to the Department of Education's Office of Civil Rights. The Department of Education's Office of Civil Rights in their so-called "Dear Colleague Letter" from April 2011:

> Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature.[27]

139.    One of the most enduring sex-based stereotypes in our society ascribes different sexual needs to men and women: Men, according to this stereotype, are sex-driven. Their sole aim is to have sex as often as possible; they desire - assuming heterosexuality – women constantly.[28]

140.    This stereotype is magnified many times over when it relates to a black or Hispanic man (especially when a white woman is involved).

141.    A "rapist" represents the most negative example of the sex-driven men: Not getting what he needs he takes it with violence (in the case of Mr. Dorta, he is accused by Ms. Lupo of covering Ms. Henrichon's mouth, an embellishment that, mind you, not even Ms. Henrichon recalled as having occurred, and the University Investigators did not even question this discrepancy because it complied with their stereotyping of Mr. Dorta).

---

[27] United States Department of Education - Office for Civil Rights: Dear Colleague Letter on Sexual Violence from April 4, 2011, p. 3, footnote 9.
[28] Compare: http://www.psychalive.org/sexual-stereotyping/, accessed April 24, 2016.

142.     To iterate the difference here: Rapists obviously exist, but the idea that all men are sex-driven and have to constantly control their sexuality in order not to become rapists presents "sex-based stereotyping and overgeneralization" in the way described above. Like any sex-based stereotype, it is in itself harmful because it "makes discrimination at once more likely and less apparent" and therefore represents a violation of Title IX.

143.     It is exactly that sex-based stereotype of males that governs the policy and the current practice with regard to gender-based harassment and sexual assault at the University.

144.     Just as discriminatory is the exclusion of an entire form of sexual violence that affects men: the absence of the issue of a "false accusation" from the school's policy (other than some vague reference to "slanderous, false or malicious statement(s) about a person or defamation of character"[29], which is meant to apply to public statements, but not formal accusations) and its current practice in dealing with sexual assault.

145.     False Accusations constitute Gender-Based Harassment. In criminal law false accusation is a serious crime, albeit rarely prosecuted in sexual assault cases. For the almost exclusively male victims a false accusation of rape is highly traumatic[30] and hugely damaging to their public reputation. All serious studies

---

[29] Quinnipiac University Sexual Misconduct and Harassment Policy.
[30] Families Advocating for Campus Equality (FACE): Proposed Amendments to the CAMPUS ACCOUNT ABILITY AND SAFETY ACT (http://nebula.wsimg.com/8b866a2382352e7b8c644a81 1 126e 1 dc? AccessKeyId=309501OB378753EOB4A8&disposition=O&alloworigin=l , accessed April 24, 2016) p. 5.

assume that false accusations occur - estimating at between 8 and 10% [31] of police reports of sexual violence are false accusations. [32]

146.     With college investigations these figure should be even higher, considering there are no real risks of punishment for the false accuser.

147.     However, the University policy does not include any kind of investigation and sanctioning against those that file false accusations. False accusation plays no role whatsoever in the University's practice in dealing with gender-based misconduct.

148.     The complete absence of any recognition of that traumatizing experience is also the reason why the University has no procedure whatsoever to support those students that were exonerated of the accusation of sexual violence.

149.     As shown above, the University's practice in dealing with sexual violence systematically precludes the possibility of female perpetrators and male victimization through a "false accusation." Thus, the University's institutional practice is largely based on the stereotype of the active, voracious, aggressive male and the passive, restrained, non-aggressive woman -- in short: of male perpetrators and female victims, which is a sex-based stereotyping and overgeneralization that is discriminatory and a clear violation of Title IX.

150.     When race, and racial/ethnic stereotypes is factored into the above, involving the stereotype of the voracious, aggressive dark skinned male and the

---

[32] Phillip N.S. Rumney shows in his review of the literature on false rape charges that serious studies converge
around a rate of eight to ten percent (Phillip N.S. Rumney: False Allegations of Rape in Cambridge Law Journal 65(1), 2006, pp. 128-158. Online available under http://eprints.uwe.ac.uk/6478/1/Download.pdf, accessed April 19, 2016.)

passive, restrained, non-aggressive white woman, this constitutes racial discrimination in violation of Title IX by the University.

151.     Thus, Mr. Dorta was deprived of educational opportunities by the University, in violation of Title IX.

152.     All Defendants assisted the University in this violation of Title IX, and to the extent permitted under Title IX, are also liable for their acts.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (For Violation of New York Executive Law Section 296(4))

153.     Mr. Dorta repeats each and every allegation hereinabove as if fully set forth herein.

154.     New York Executive Law, Article 15, Human Rights Law, section 296(4) provides in pertinent part: "It shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]"

155.     Based on the foregoing, the University permitted discrimination against Mr. Dorta on the basis of his sex and race and color.

156.     Based on the foregoing, the University authorized, condoned, approved of and/or acquiesced to gender-based, race-based, and color-based harassment against Mr. Dorta.

157.     Based on the foregoing the University had actual knowledge of such harassment and discriminatory conduct and failed to undertake any action to prevent or stop it, and intentionally discriminated against Mr. Dorta on the basis of his male sex and his race and color.

158.    Based on the foregoing , the University engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law§ 296(4).

159.    As a result of the foregoing, Mr. Dorta is entitled to damages for past acts of gender based, race based and color based harassment in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

160.    All Defendants assisted, aided and abetted the University in this violation of the New York Executive Law, Article 15, Human Rights Law, and to the extent permitted under the law, are also liable for their acts.

161.    Moreover, the New York Executive Law, Article 15, Human Rights Law, Section 298-A – "Application of article to certain acts committed outside the state of New York" provides in relevant part as follows:

"1. The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state or against a corporation organized under the laws of this state or authorized to do business in this state, if such act would constitute an unlawful discriminatory practice if committed within this state…3.If a non-resident person or foreign corporation violates any provision of this article by virtue of the provisions of this section, such person or corporation shall be prohibited from transacting any business within this state.

162.    Thus, in so far as the University conducts business within New York State, for example, via the solicitation and admission to the University of students from New York State, it should be prohibited from transacting such business forthwith.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Breach of Contract Against the University)

163.    Mr. Dorta repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

164.    Based on the aforementioned facts and circumstances, the University breached its agreement with Mr. Dorta as a matter of law.

165.     The University's acceptance of Mr. Dorta into a degree program at the University and his subsequent enrollment and payment of tuition fees created an express contract or, alternatively, a contract implied in law or in fact between Mr. Dorta, his parents and the University governed by, among other things, its Policies.

166.     The University breached its obligations to Mr. Dorta, as set forth in its Policies.

167.     Among other things, the University breached its obligations regarding confidentiality and privacy, retaliation, the equal treatment of complainants in investigations and respondents, to provide a fair process in a misconduct investigation, to treat Mr. Dorta as innocent until proven guilty, and to act in good faith.

168.     Based on the foregoing, Mr. Dorta is entitled to recover damages for the University's breach of the express and/or implied contractual obligations described above. As a direct and foreseeable consequence of these breaches, Mr. Dorta sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages. As a result of the foregoing, Mr. Dorta is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE FOURTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress Against All Defendants)**

169.     Mr. Dorta repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

170.     Based on the foregoing facts and circumstances, Defendants intentionally discriminated against Mr. Dorta when it condoned a hostile educational environment with actual knowledge of, a deliberate indifference to, and an apparent approval of said gender-based, race-based and color-based harassment and misconduct, and allowed Mr. Dorta to be effectively denied equal access to the University's resources and opportunities.

171.     The above actions and inactions by Defendants, detailed above, were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress to Mr. Dorta, as well as financial loss, humiliation, loss of reputation and other damages.

172.     As a direct and proximate result of the above conduct, Mr. Dorta sustained substantial damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages. As a result of the foregoing, Mr. Dorta is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Mr. Dorta respectfully prays the Court for Judgment as follows:

(i) on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against The University awarding Mr. Dorta: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as a result of the hostile educational environment in violation of Title IX, and (ii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that The University has intentionally discriminated against Mr. Dorta as a black/Hispanic male victim of race-based, color-based and gender-based harassment, sexual harassment and gender-based misconduct and as a falsely accused black/Hispanic male student by condoning and creating a hostile educational environment, with the consequence that Mr. Dorta has been effectively denied equal access to The University's resources and opportunities, thereby undermining and detracting from Mr. Dorta's educational experience;

(ii) on the second cause of action for violation of New York Executive Law Section 296(4), a judgment against The University awarding Mr. Dorta: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as a result of hostile educational environment in violation of New York Executive Law Section 296(4), (ii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that The University has intentionally discriminated against Mr. Dorta on the basis of his male sex, his color and race by condoning a hostile educational environment, with the consequence that Mr. Dorta has been effectively denied equal access to Defendant The University's resources and opportunities, thereby undermining and detracting from Mr. Dorta's educational experience, and (iii) a declaratory judgment that the University may not conduct business in New York State;

(iii) on the third cause of action for breach of contract, a judgment against The University awarding Mr. Dorta damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, as well as consequential damages to physical well-being, emotional and psychological damages, damages to reputation, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) on the fourth cause of action for intentional infliction of emotional distress, a judgment against all Defendants awarding Mr. Dorta damages in an amount to be determined at trial, including, without limitation, damages to psychological well-being, emotional and psychological damages , damages to reputation , past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects , plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) awarding Mr. Dorta against The University and the other Defendants such other and
further relief as the Court deems just , equitable and proper.

Dated: New York, New York

      November 10, 2016

                              THE LAW OFFICE OF
                              J.A. SANCHEZ-DORTA, P.C.
                              *Attorneys for Plaintiff E. Dorta*

                        By:

                              J.A. Sanchez-Dorta
                              225 Broadway, Suite 1901
                              New York, New York 10007
                              Tel: 646.657.5345
                              Fax: 347.809-4540
                              janthonysanchez@post.harvard.edu
                              Attorney Bar Code JS3070